UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| **DENNIS SIGMAN, D.D.S.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No. 1:16-0020 |
| ) | **Judge Sharp** |
| **TENNESSEE VALLEY AUTHORITY,** ) | |
| ) | |
| **Defendant.** ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a case about the future of fourteen trees. The trees are located on property owned by Plaintiff Dennis Sigman. Defendant Tennessee Valley Authority ("TVA") has evidenced the intention to cut down the trees because they allegedly present a danger to its power line which runs behind Plaintiff's home. The central issue in this case is whether the TVA's decision to remove the trees was based on the now-abrogated "15 foot rule."

A bench trial was held on Plaintiff's Complaint in Columbia, Tennessee on August 1, 2016, after which the parties were afforded the opportunity to submit proposed findings of facts and conclusions of law, and post-trial briefs. The last of those filings was made on October 6, 2016.

After reviewing the parties' proposed findings and conclusions, their arguments, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Except where the Court discusses different testimony on a specific issue, any contrary testimony on that matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts it deems

1

to be immaterial to the issues presented. Finally, to the extent that a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.

**I. Findings of Fact**

1. Plaintiff is a dentist who practices in Lewisburg, Tennessee, and resides at 2428 Hidden Lake Circle in Columbia, Tennessee. His residential property, a 2.2-acre wooded lot with a house and a pool, was purchased by Plaintiff in 2000 or 2001.

2. On November 23, 1939, the United States of America, for the use of the TVA, acquired an easement (or right-of-way) at the back of the property by virtue of a Grant of Transmission Line Easement.

3. The easement is properly recorded in the Deed Book in the Maury County, Tennessee Registrar's office, and was so at the time Plaintiff purchased the property.

4. The easement is 150' wide, one side of which runs along the rear of Plaintiff's property, and extends into large areas of Plaintiff's backyard. Part of the swimming pool on the property sits in the right-of-way, as does the corner of the garage.

5. The Grant of Transmission Line Easement provides

> a permanent easement and right-of-way for the following purposes, namely: the perpetual right to enter and to erect, maintain, repair, rebuild, operate, and patrol one or more electric power transmission lines, and one or more telephone and/or telegraph lines, including the right to erect such poles and other transmission line structures, wires, cables, and any necessary appurtenances, the right to clear said right-of-way and to keep the same clear of brush, timber, inflammable structures, and fire hazards; and the right to remove danger tees, if any, located beyond the limits of said right-of way; all over, upon, across, and under the [150-foot wide right-of-way].

(Govt. Exh. 4 at 1).

6. Pursuant to the easement, the TVA erected a 161,000 volt electrical transmission line within the right-of-way as part of its construction of the Wheeler to Maury transmission line. The transmission line and an eighty-foot transmission tower (Tower 287) had been constructed and were in existence at the time Plaintiff purchased the property. The base of the tower sits approximately 13 feet from Plaintiff's backyard fence.

7. Three are three zones in the right-of-way. The clear-cut zone is directly below the power line and extends 50 feet out; the buffer zone is the area between 50 and 75 feet from the center line, and the danger tree zone is the area extending beyond 75 feet from the center line.

8. In 2003, TVA performed right-of-way vegetation maintenance on the property during which it clear cut all trees and vegetation in the right-of-way, including a stand of pines. The TVA also trimmed the backside of a 100-year old oak that was approximately 4 feet from the swimming pool, and topped a nearby maple tree.

9. In February 2016, Plaintiff found a tag on his front door indicating that the TVA had scheduled upcoming right-of-way maintenance on his property. Plaintiff called the TVA and asked to speak to a forester to discuss the matter.

10. On March 4, 2016, Plaintiff met with William Sanders on the property regarding vegetation maintenance. Mr. Sanders is the TVA forester responsible for the TVA Centerville section. Plaintiff claims that Mr. Sanders told him that "we're gonna have to cut everything." (Tr. Trans. at 31). No decision was made regarding removal of trees on that day, but a follow-up meeting was arranged.

11. On March 11, 2016, Plaintiff met with Mr. Sanders and his boss, John Dooley, the TVA right-of-way manager for the west service area, which includes Maury County. Also present was

Alia Nash, Plaintiff's personal assistant, and a number of neighbors who had heard about the meeting. This was the first and only time (prior to trial) that Plaintiff had spoken with Mr. Dooley.

12. The March 11, 2016 meeting was not amicable. Plaintiff claims that immediately after Mr. Dooley got out of his truck, Mr. Dooley declared that they were "going to have some ground rules here," (Docket No. 32) to which Plaintiff demurred. Things did not get better.

13. Plaintiff claims that when Mr. Dooley went into the backyard, he declared, "all these trees are over 15 feet," and "[t]hey've got to go," (id.) a statement Mr. Dooley repeated in various iterations during the course of the meeting. According to Plaintiff the 15-foot issue "was pretty much a big deal with" Mr. Dooley, (id.). Plaintiff also claims that when Mr. Dooley saw the pool with the adjacent oak tree he stated "this is all your fault," even though the pool and oak existed long before Plaintiff purchased the residence.

14. Ms. Nash was present in the backyard when Mr. Dooley allegedly made the "15 foot" statements. She claims to have asked, "are you saying that any tree that is 15 feet or larger has to be cut down?", to which Mr. Dooley responded, "that is correct." (Id.). Mr. Sanders was also in the backyard for a portion of the time, but did not hear Mr. Dooley say anything to the effect of any trees over 15 feet having to be removed.

15. Mr. Dooley concedes that he did not set the proper tone at the start of the meeting, but was taken aback by the number of people present. He does not recall telling Plaintiff that he would be applying the 15-foot rule to the trees on the property.

16. Having had the opportunity to listen to the conflicting testimony, the Court finds that, while tree heights may have been discussed during the course of the conversation between Mr. Dooley and Plaintiff, and that 15-foot may have been mentioned to provide context and perspective

4

regarding the dimension of trees, Mr. Dooley did not invoke the 15-foot rule, or specify to either Plaintiff or Ms. Nash that any tree over 15 feet would have to come down. In making this finding, the Court recognizes Plaintiff's position that Mr. Dooley's testimony was at best equivocal because, in response to the question, "Did you tell Dr. Sigman that you were applying the 15-foot rule with respect to trees on his property?", Mr. Dooley replied, "Not to my knowledge." (Tr. Trans. at 115). However, the Court's finding is based upon the entirety of Mr. Dooley's testimony and his credibility.

17. It is unclear how long the meeting on March 11, 2016 lasted, but it ended when Plaintiff walked away from the discussion dissatisfied. Towards the end of the meeting, Mr. Sanders had a private conversation with Plaintiff. During that conversation, Plaintiff told Mr. Sanders that if Mr. Dooley came back to the property again, he would meet him with a Glock firearm.

18. At the time of the March 11, 2016 meeting, the TVA right-of-way boundaries had not been marked, nor had any trees been identified for removal because Plaintiff had not allowed TVA contractors access to the property.

19. A follow-up meeting was held on March 16, 2016. In attendance was Plaintiff, Mr. Sanders, and Lonnie Cable, the foreman of a tree removal contractor. Assisted by a laser range finder, Mr. Sanders marked the right-of-way with small white flags. He discussed the trees with Plaintiff and identified 24 trees in the right-of-way, or in the danger zone immediately adjacent thereto. Of those, Mr. Sanders identified 14 trees that would be cut down, and 10 trees that would remain standing. Those that would not be cut were marked by green survey tape.

20. Mr. Sanders made the initial agency decision to cut trees based upon 2008 guidelines, which, in turn, were modeled after rules promulgated in 1997. He did not use the 15-foot rule in

5

making his decision, nor was he instructed by Mr. Dooley to use that rule.

21. The 2008 guidelines provide that, with regard to "161-kV transmission lines," where the TVA has "150 feet of easement, [it] will re-clear 100 feet, that is, 50 feet from centerline to outside edges, leaving a 25-foot buffer zone on each side." (Govt. Ex. 2 at 34). The guidelines also provide that "dangerous trees" off the right-of-way and "[t]all growing trees" on the right-of-way "will be cut." (Id. at 35). These, however, are the "minimum requirements" under the guidelines, and "[t]he whole easement may be re-cleared if TVA has the perpetual rights and it is the desire of management.'" (Id. at 34).

22. Plaintiff requested that the TVA reconsider the March 16, 2016 decision. Mr. Dooley, as the designated agency official, reconsidered the decision, and, as a part of the process, arranged for TVA botanists to assess the species, estimate heights, and the growth rates of the trees. The botanists submitted a written summary of their assessment to Mr. Dooley. Upon review, Mr. Dooley concluded that TVA would proceed with removal of the fourteen trees previously designated by Mr. Sanders to be cut down.

23. The final Vegetation Maintenance Decision was entered on March 28, 2016. The trees to be cut are identified in the Decision by numbered red dots, while those allowed to remain are identified by numbered green dots.

24. The TVA tree survey of Plaintiff's property show that the vast majority of trees are in the clear-cut zone. This includes a Norway or Nikko Spruce (identified as Tree 14) that is of particular interest to Plaintiff because he claims owls live there. That tree stands just over 45 feet tall and is 44.7 feet from the centerline. Two other trees also of concern to Plaintiff are a maple (Tree 8) and a Red Oak (Tree 10) that are adjacent to his pool. Both trees sit in the buffer zone, but

6

the oak tree is 80.3 feet high and sits 69.3 feet from the center of the transmission line tower, while the maple is 60.8 feet high and sits 56.1 feet from the TVA tower.

25. On the same day as the final decision by the TVA, Plaintiff filed a Complaint in this Court. He alleges that TVA's proposed action violates the National Environmental Policy Act ("NEPA"), 42, U.S.C. § 4321, *et seq.*. Plaintiff also alleges that TVA's proposed action constitutes an unlawful taking.

26. Contemporaneously with the filing of the Complaint, Plaintiff filed a Motion for Temporary Restraining Order or Preliminary Injunction. After a hearing, the Court granted a preliminary injunction pending trial that prohibited the TVA from cutting trees absent "an unforeseen and entirely justifiable emergency" necessary "to preserve the integrity of the power lines." (Docket No. 18 at 7). Plaintiff was required to post $1,000 security as bond for the issuance of the injunction.

## II. Conclusions of Law

1. "Congress enacted [NEPA] '[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment [and] to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man[.]'" Save Our Cumberland Mountains v. Kempthorne, 453 F.3d 334, 337-38 (6th Cir. 2006) (quoting 42 U.S.C. § 4321). This Court has jurisdiction over the NEPA claim set forth in Count One of Plaintiff's Complaint pursuant to the Administrative Procedures Act ("APA"). Sierra Club v. Slater, 120 F.3d 623, 631 (6th Cir. 1997).

2. The TVA argues that "[e]xcept in rare circumstances, the capacity of a district court to engage in factfinding through a trial is simply not applicable to judicial review under the APA of

an informal agency decision," and "[w]hile *de novo* fact finding sometimes may be necessary for some issues in an APA case . . . it is not applicable to review of the challenged decision itself." (Docket No. 34 at 11). Rather "'[i]n a case brought under the [APA], the district court is limited to reviewing the administrative record to determine whether the agency decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law.'" (Id. at 12, quoting Advocacy & Res. Corp. v. U.S. Dep't of Agric., 2011 WL 4738250, at *4 (M.D. Tenn. Oct. 6, 2011). Thus, the "'focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" (Id. quoting, Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty., 286 F.3d 382, 387 (6th Cir. 2002)). All of this is true as a general matter, but analysis of an NEPA claim is a bit more nuanced.

3. In controlling authority cited by neither party, the Sixth Circuit observed that "[i]n APA actions involving NEPA, there is a special standard of review for arbitrariness." Latin Am. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin., 756 F.3d 447, 464 (6th Cir. 2014). The court went on to explain:

> "In deciding whether the agency acted arbitrarily, we will not substitute our own judgment for that of the agency," but we will "insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision." . . .
>
> A court's review under this standard is highly deferential to agency decisions. However, "[a]n agency is not entitled to deference simply because it is an agency. It is true that agencies are more specialized than courts are. But for courts to defer to them, agencies must do more than announce the fact of their comparative advantage; they must actually use it." . . .
>
> Normally, a court's review of an agency action under the APA to determine whether the agency decision was arbitrary and capricious is limited to the administrative record, which includes materials compiled by the agency at the time its decision was made. . . . However, certain circumstances justify supplementation of the administrative record. Such circumstances include when an agency has deliberately

8

or negligently excluded certain documents from the record, or when a court needs certain 'background' information to determine whether the agency has considered all relevant factors. . . . The burden is on the plaintiff to justify supplementation of the record and plaintiff must make a "strong showing" of bad faith.

Id. At 464-65 (citations omitted). Whether to allow supplementation of the record is "reviewed on appeal for an abuse of discretion." Slater, 120 F.3d at 638.

4. In this case, receipt of "background information" was appropriate given the allegations in Plaintiff's Verified Complaint that he was told by Mr. Dooley that any trees standing over 15 feet high would have to be cut down. This contention was reiterated by both Plaintiff and Ms. Nash at the hearing on Plaintiff's Motion for a Temporary Restraining Order or Preliminary Injunction, and the TVA chose not to put on any witnesses to rebut that testimony. If the testimony was true, it suggested that the decision to remove trees was contrary to law or arbitrary and capricious because Jacinda B. Woodward, TVA's Senior Vice President of Transmission and Power Supply, filed a Declaration in response to another case in which she stated that she had "suspended use of the 15-foot rule and reverted to the right-of way maintenance practices that were utilized prior to the introduction of the 15-foot rule." (Docket No. 1-2 at 2).

5. Ms. Woodward's declaration was filed in a case pending in the Eastern District of Tennessee styled Sherwood v. TVA. There, plaintiff challenged transmission line vegetation maintenance guidelines adopted by the TVA in 2012 that allowed the removal of trees along its transmission lines which had or would reach 15 feet. On appeal from the grant of summary judgment in favor of the TVA, the Sixth Circuit held that, "[i]n the past, TVA has given the right-of-way specialists discretion to remove, or not remove, trees within the border zone," but "[t]he new rule appears to eliminate that discretion." Sherwood v. Tenn. Valley Auth., 590 Fed. App'x 451, 460 (6th Cir. 2014). It determined a remand to be appropriate because NEPA "requires federal

agencies to consider the significant environmental effects of a proposed action," id., and the TVA had not submitted an administrative record showing that it considered the environmental consequences of the newly enacted 15-foot rule. On remand, the TVA acknowledged in the district court that it had not created a separate administrative record for the 15-foot rule and, as a consequence, claimed to have reverted to using the 2008 guidelines.

6. As noted at the outset, the central issue in this case is whether the TVA utilized the 15-foot rule in deciding which trees to cut. Based on both the administrative record and the evidence adduced at trial, the Court concludes that it did not.

7. The administrative record contains the 2008 guidelines (including those applicable to 161-kV transmission lines), Ms. Woodward's Declaration (as well as a second, confirmatory Declaration), and the Sixth Circuit's decision remanding the Sherwood case, all of which suggest cognizance of and the need to avoid using the 15-foot rule. More importantly, the tree survey in the Administrative Record shows that, of the 10 trees the TVA decided to allow to remain, 8 are taller than 15 feet.

8. The evidence presented at trial bolsters the Administrative Record. This is true even if the Court ignores the specific finding that Mr. Dooley did not tell either Plaintiff or Ms. Nash that he was going to use the 15-foot rule in deciding which trees to cut.

9. The statements attributed to Mr. Dooley were made on March 11, 2016. However, Mr. Sanders made the initial decision days later on March 16, 2016. In making that decision he did not use the 15-foot rule, nor was he instructed to do so by Mr. Dooley. Had Mr. Sanders strictly adhered to the 15-foot rule, more trees would have been designated for cutting. Further, while Mr. Dooley was the final decisionmaker, he did not change Mr. Sanders' designations regarding which trees to

10

cut.

10. In Sherwood, the Sixth Circuit held that "the 15-foot rule is inconsistent with TVA's historic policy of giving specialists discretion to remove trees[.]" Sherwood, 590 F. App'x at 460. The 2008 guidelines, however, do not suffer from that infirmity, and those guidelines were used by Mr. Sanders in deciding which trees to cut.

11. Plaintiff has not shown that the TVA's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. As such, he is not entitled to permanent injunctive relief that would prohibit the TVA from cutting trees on his property, nor is he entitled to costs and attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

12. As an alternative to injunctive relief, Plaintiff requests that this case be stayed pending an appeal of the remanded case in Sherwood. "'[T]he burden is on the party seeking the stay to show that there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." F.T.C. v. E.M.A. Nationwide, Inc., 767 F.3d 611, 627-28 (6th Cir. 2014) (quoting Ohio Envt'l. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div., 565 F.2d 393, 396 (6th Cir. 1977)). "'The most important factor is the balance of the hardships, but '[t]he district court must also consider whether granting the stay will further the interest in economical use of judicial time and resources.'" Id. (quoting, Int'l Bhd. of Elec. Workers v. AT & T Network Sys., 879 F.2d 864, 1989 WL 78212, at *8 (6th Cir. Jul. 17, 1989)).

13. Plaintiff has made no effort to show that a stay is appropriate. This case involves the issue of whether the TVA used the 15-foot rule to make the March 2016 decision to cut fourteen trees on its right-of-way across Plaintiff's property. There is no suggestion that this decision can somehow be linked to whatever issues are raised on appeal in the Sherwood case. To the contrary,

the trial court in Sherwood found plaintiff's NEPA claim to be constitutionally or prudentially moot because the TVA acknowledged that it did not comply with the procedural requirements of NEPA when it adopted the 15-foot rule, and the TVA "made a genuine assurance that it ha[d] ceased use of the fifteen-foot rule and that it will conduct a NEPA review prior to either re-implementing the fifteen foot rule or adopting some other vegetation management practice." Sherwood v. TVA., 124 F. Supp. 3d 779, 784 (E.D. Tenn. 2015).

14. Plaintiff's takings claim as set forth in Count Two of the Complaint fails for both procedural and substantive reasons.

15. Procedurally, Plaintiff has abandoned this claim. In his trial brief, Plaintiff wrote: "the inverse condemnation argument may not be ripe for adjudication. Therefore, no further analysis will be made of this claim." (Docket No. 29 at 1 n.1). Nor did Plaintiff present any argument regarding his takings claim in any of the post-trial filings. See, Brown v. VHS of Michigan, Inc., 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); Conner v. Hardee's Food Sys. Inc., 65 F. App'x 19, 24-25 (6th Cir. 2003) ("Because Plaintiffs failed to brief the issue before the district court . . . Plaintiffs abandoned their implied-in- law contractual claim"); Harbison v. Little, 723 F. Supp. 2d 1032, 1038 (M.D. Tenn. 2010) ("If a plaintiff fails to include arguments regarding a claim in a post-trial brief, the court is justified in finding that the plaintiff has abandoned that claim.").

16. Substantively, Plaintiff's takings claim fails because he proffered no evidence at trial that would suggest he suffered an unlawful taking under the Fifth Amendment as alleged in the Complaint.

17. "The Takings Clause of the Fifth Amendment prohibits taking 'private property . . . for public use, without just compensation.'" Puckett v. Lexington-Fayette Urban Cty. Gov't, 2016 WL 4269802, at *12 (6th Cir. Aug. 15, 2016) (quoting, U.S. Const. amend. V). A two-part test is used in determining whether there has been an unlawful taking:

> First, "the court must examine whether the claimant has established a cognizable property interest for the purposes of the Just Compensation Clause.' . . . Second, "where a cognizable property interest is implicated, the court must consider whether a taking occurred."

Id. (internal citations omitted).

18. Insofar as Plaintiff's taking claim is based upon removal of trees – something that has yet to occur – the Court simply notes that the prior owners granted a permanent easement that allowed the TVA the perpetual right to clear the right-of-way and remove "danger trees" beyond the right of way. See Sherwood, 560 F. App'x at 462 (discussing standard TVA easement and noting that "[u]nder Tennessee law, the scope of an easement created by a grant is determined by the language of the grant" and "[t]he easements involved here unambiguously give the United States three rights: (1) the right to enter and to construct electric transmission line structures, (2) the right to clear the easements of brush, trees, and timber, and (3) the right to remove danger trees from the surrounding land"). Insofar as Plaintiff fears that removal trees will damage his pool or otherwise harm his property, the "Constitution does not require pretaking compensation, and is instead satisfied by a reasonable and adequate provision for obtaining compensation after the taking[.]" Williamson County Reg'l Planning Comm. v. Hamilton Bank, 473 U.S. 172, 195 (1985); see, Tri-Corp Mgmt. Co. v. Praznik, 33 F. App'x 742, 748 (6th Cir. 2002) ("A takings claim is not ripe for review unless a property owner is denied just compensation."); In re TVA Ash Spill Litig., 805 F. Supp. 2d 468, 493 (E.D. Tenn. 2011) ("stating that "if TVA's conduct resulted in a taking of

13

property in the vicinity of, surrounding, or adjacent to plaintiffs' properties, such conduct is not a taking unless it also resulted in a diminution of plaintiffs' property rights that rises to the level of a taking").

19. Defendant requests that it receive the $1,000 bond posted by Plaintiff as security. The request will be denied.

20. "[T]he majority rule [is] that there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the security executed so as to recover provable damages up to the amount of the security." Glob. Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 23 (1st Cir. 2007). However, even though "a wrongfully enjoined party is entitled to a presumption in favor of recovery, that party is not automatically entitled to the damages sought." Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 559 (2nd Cir. 2011). Rather, "the presumption applies to 'provable' damages," and "[t]hus, the wrongfully enjoined party must first demonstrate that the damages sought were proximately caused by the wrongful injunction." Id. This is in keeping with Rule 65(c)'s language that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers *proper to pay the costs and damages sustained* by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added).

21. The TVA seeks recovery of the security bond "in consideration of additional costs that TVA will incur, as a result of the injunction, for its contractor to return to the property to perform the vegetation maintenance at issue in this lawsuit." (Docket No. 19 at 34). The TVA points to no evidence in the record, however, showing that it will actually incur additional costs because of the injunction or the amount of any such costs. Nor has it been shown that, prior to the filing of the

request for an injunction, the TVA's contractor was onsite with the necessary equipment at hand, and ready, willing, and able to cut the trees.

22 .   Plaintiff has not proven either of its claims and, accordingly, Defendant is entitled to judgment in its favor.  The bond posted as security will be returned to Plaintiff.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE